**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **PAY AS YOU GO, LLC,**<br><br>Plaintiff,<br>v.<br><br>**SINCH AMERICA, INC.,**<br><br>Defendant. | C.A. No. 1:26-cv-11461<br><br>**JURY TRIAL DEMANDED**<br><br>**PATENT CASE** |

# COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Pay As You Go, LLC, files this Complaint for Patent Infringement against Sinch America, Inc., and would respectfully show the Court as follows:

## I. THE PARTIES

1. Plaintiff Pay As You Go, LLC ("PAYG" or "Plaintiff") is a Wyoming limited liability company having an address at 1712 Pioneer Ave Suite 500, Cheyenne, Wyoming 82001.

2. On information and belief, Defendant Sinch America, Inc. ("Sinch" or "Defendant") is a Delaware corporation with a regular and established place of business at 1 N Wacker Dr, STE 2500, Chicago, Illinois 60606. Defendant has a registered agent at Corporation Service Company, at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

## II. JURISDICTION AND VENUE

3. This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4. On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Illinois Long-Arm Statute, due at least to its

business in this forum, including at least a portion of the infringements alleged herein at 1 N Wacker Dr, STE 2500, Chicago, Illinois 60606.

5. Without limitation, on information and belief, Defendant has derived revenues from its infringing acts occurring within Illinois. Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from goods and services provided to persons or entities in Illinois. Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its sale of products and/or services within Illinois. Defendant has committed such purposeful acts and/or transactions in Illinois such that it reasonably should know and expect that it could be sued in this Court as a consequence of such activity.

6. Venue is proper in this District under 28 U.S.C. § 1400(b). On information and belief, Defendant has a regular and established place of business in Illinois and in this District at 1 N Wacker Dr, STE 2500, Chicago, Illinois 60606. On information and belief, from and within this District, Defendant has committed acts of infringement, including at least a portion of the infringements at issue in this case.

7. For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

## III. <u>THE PATENT-IN-SUIT</u>

8. Plaintiff incorporates the above paragraphs herein by reference.

9. On March 14, 2006, United States Patent No. 7,013,127 ("the '127 Patent") was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '127 Patent is attached hereto as Exhibit A and incorporated herein by reference.

10. PAYG is the assignee of all right, title, and interest in the ‘127 patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the ‘127 Patent. Accordingly, PAYG possesses the exclusive right and standing to prosecute the present action for infringement of the ‘797 Patent by Defendant.

## Background of the Invention

11. The ’127 Patent relates to telecommunications services and methods that enable a user and/or other responsible party to make payments as the user uses the telecommunication services.

12. As described in the specification of the ‘127 Patent, before the invention claimed in the ‘127 Patent, it was known in the art of telecommunication services to provide calling card accounts to customers. A customer would receive account information in the form of a personal identification number (“PIN”) and a toll-free access number that allowed the customer to utilize the account. Those accounts were generally one of two types: (1) a pre-paid account, which was an account with a pre-defined amount of usage paid for in advance by the customer; and (2) a usage-based account, which was an account that is billed on a periodic billing cycle according to usage during the billing period. Pre-paid wireless (cell phone) service was one example of a pre-paid account.

13. Prior to the ‘127 Patent, pre-paid wireless service enabled customers to use the convenience of cellular and digital communications by establishing a pre-paid account with a wireless telecommunication vendor. Typically, pre-paid wireless cards, each card corresponding to a wireless services account, were purchased in preset denominations, such as $20, $50 or $100, often from a limited number of locations. Each card provided the user with a specified amount of wireless calling dollars or minutes. After the initial allocation was exhausted, the user could

"recharge" or reload their wireless account, usually by calling a toll-free number, and either talking with a customer service representative or using an automated system to charge additional calling dollars or minutes to a credit card.

14. There were many inventions directed to these types of systems and methods. For example, U.S. Pat. No. 6,185,545 discloses a method for effecting payment of goods or services that establishes an intermediary account associated with the user account to permit the user to pre-pay for telecommunications services. Another patent, U.S. Patent No. 6,282,276, discloses value-added service calls that traditionally have been "800" or "900" number calls. U.S. Patent No. 6,397,055 discloses a system and method for charting a pre-paid wireless call user. U.S. Patent No. 6,424,706 discloses a system and method for accessing the value associated with a pre-purchased amount of telecommunication time. WO 01/82582 discloses communication billing systems that provides interrelated processing of wireless service events and wire line service events. WO 02/11422 discloses a communication account system for dynamically providing communication accounts to communication devices for immediate transfer to users, including a means for determining an amount of prepaid time for communication.

15. These prior art pre-paid systems were burdensome to both the user and the telecommunication service provider. Moreover, these prior art pre-paid systems generally required that the user have a current credit card with an available balance, which created a significant burden in and of itself to certain classes of user, such as individuals who lacked sufficient regular income, individuals with too much existing debt, individuals with poor credit histories, and individuals who lacked and/or were unable to obtain a social security number.

## The Patented Invention

16. The '127 Patent discloses specific improved methods for effecting payment for pay-as-you-go telecommunication services via a third-party. The claimed method comprises: monitoring a user's use of telecommunication services at regular time intervals; communicating results of the monitoring to the provider of the telecommunication services, who then processes the results and communicates those to the user; and receiving a payment from the user, wherein: (i) the payment is received from the user at a third-party point-of-sale together with an account identifier, (ii) data indicative of the payment transaction is received sale by the telecommunication services provider from the third party; and (iii) an amount of money equal to the payment is received by the telecommunications services provider from the third-party. The point-of-sale can be a physical location, such as a retail merchant site; a vending machine; and an automated teller machine, or a virtual location, such as a website or application. The payment at the point-of-sale can be made in any acceptable form, including cash, a wire-transfer or bank-transfer, a debit card transaction, and a credit card transaction.

17. The methods of the claimed invention are an improvement over conventional methods that allow a user to pay as the telecommunication services are being used (*i.e.*, "pay-as-you-go"). Various embodiments of pay-as-you-go methods are illustrated in FIG. 1 and FIG. 2 of the '127 Patent.

18. Unlike standard mobile phone calling plans that charged a set monthly fee for a specific amount of calls or usage, pay-as-you-go plans only required the user to purchase minutes or usage when they would like to make a call or use the telecommunication services. This was a significant advantage to consumer-users who did not want to be bound by an annual, or even biannual, contract, as well as to consumer-users who did not possess sufficient credit (or credit-

worthiness) to qualify for such a contract. This latter group included not only individuals with bad credit ratings, but also hourly-wage earners, individuals under the age of 18, and individuals unable to obtain a social security number.

19. Pay-as-you-go calling plans also represented an advance to consumer-users who, for whatever reason, wanted to preserve their privacy and so were reluctant to enter into a contract with a telecommunications service provider that would require the disclosure of confidential personal information, like the consumer-user's name, home address, social security number, and the like. In 2020, there were approximately 74 million pay-as-you-go consumer-users in the United States.

20. Pay-as-you-go systems also provide an advantage for telecommunication service providers. With pay-as-you-go systems, use of the telecommunication services can be suspended by the telecommunication services provider upon the available balance in a user's account being fully consumed. And, because use is monitored at regular time intervals, such a suspension can generally be achieved before the user and/or the responsible party accumulates any balance due.

21. However, a significant drawback of prior art pay-as-you-go systems and methods was the inability to add extra time or services after the initial purchase of the phone and time without a credit or debit card. Because of this, many prior art pay-as-you-go systems and methods were almost as bad as standard mobile phone calling plans for individuals with bad credit ratings, hourly-wage earners, individuals under the age of 18, and individuals without social security numbers. Such systems and methods were also less-than-desirable for individuals who wished to protect their private, personal confidential information and/or preserve their anonymity through cash-only transactions or the like. For all of those different groups of individuals, prior to the invention of the methods claimed in the '127 Patent, the only solution to the problem of running

out of time was to purchase another pre-paid phone altogether—a "solution" which could end up being prohibitively expensive in the long term.

22. Unlike prior art pay-as-you-go systems and methods which required direct payment from a user to the telecommunications service provider via a credit or debit card to add time or data for further use, the methods of the invention claimed in the '127 Patent permit a user to make payments via a third-party point-of-sale site. Such a third-party point-of-sale site may be a physical location, such as a gas station or convenience store equipped with an electronic point-of-sale device, or a virtual location, such as a website or app like PayPal® or Venmo®. While such payments can be made electronically, *e.g.*, via credit card, debit card, check card or any other such means, including on-line banking, they do not have to be made electronically like the prior art systems required. Rather, payments according to the invention claimed in the '127 Patent can also be made in cash, *i.e.*, the user can make a payment with cash at a designated location, and the amount paid at the designated location will credited to the user's account to cover the services rendered in step 68 of FIG. 2.

23. To use a designated location 12 to make payment, a user 10 may be issued an account identifier 14, *e.g.*, an individual account number, in step 62 of FIG. 2, that uniquely identifies that user 10. Such an account identifier 14 enables a user 10 to make a payment at the designated location in step 64 of FIG. 2. As noted above, this may be done, *e.g.*, via a point-of-sale terminal 16, where a user's credit card or debit card is "swiped" both to identify the user 10 and to collect payment of a specified amount, or where a user physically inserts cash in the form of paper bills and/or metal coins and enters his/her account identifier via a pin pad or the like. The payment information is then relayed to the telecommunication services provider 18 in step 66 of FIG. 2. The designated location 12 can be any physical or virtual location that processes a credit

or debit card and/or can accept cash, *e.g.*, retail stores such as a dry cleaner, a drug store, a supermarket, or a convenience store, etc., and websites and mobile applications like PayPal®.

24. The inventions claimed in the '127 Patent include methods that enable a user of pay-as-you-go telecommunication services to make payments for those telecommunications services via a third-party point-of-sale.

25. Prior to the invention claimed in the '127 Patent, users of telecommunications services that did not have a credit card, debit card, and/or linkable bank account were generally unable to use "pay as you go" systems. This requirement presented a problem to users with bad credit ratings, hourly-wage earners, and individuals under the age of 18, as well as individuals who wished to protect their privacy and/or preserve their anonymity.

26. The methods claimed in the '127 Patent are directed to novel ways of permitting users of telecommunications services to purchase those services on an as-needed basis without needing a credit card, debit card or linkable bank account, and without having to disclose personal identifying information. This represents a significant advantage to users with bad credit ratings, hourly-wage earners, individuals under the age of 18, and individuals without social security numbers, as well as individuals who wished to preserve their anonymity.

27. Claim 1 also provides a specific technical solution for integrating disparate systems, including telecommunication usage monitoring systems, telecommunication billing systems, and retail point-of-sale systems into a unified payment framework. For example, the limitation "monitoring a user's use of the telecommunication services at regular time intervals" is a technical element that involved not merely collection information but implements a specific technical monitoring mechanism that executes operations at defined intervals, which differs from traditional post-paid billing cycles. This real-time processing capability requires technical infrastructure to

capture, process, and communicate usage data at predetermined intervals rather than relying on traditional monthly billing cycles. This represents a technical advancement because it enables immediate awareness of usage patterns and allows for responsive system actions based on current usage data. The specification of US 7,013,127, in column 4, lines 44-49, describes this as enabling the telecommunication services provider to produce "the equivalent of an updated invoice" immediately upon completion of service use. The technical implementation requires the system to maintain a running tally of usage that is updated every monitoring interval, implement algorithms to aggregate these frequent data points into billable amounts, and provide instant access to this information when the user ends their session. This transformation from reactive billing systems to proactive usage management represents a technical solution to the problem of efficiently allocating resources and notifying users in telecommunication services. Regular interval monitoring establishes a technical framework that maintains ongoing awareness of system utilization, enabling both service providers and users to make informed decisions based on current usage data rather than historical data.

28. The limitation “communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user” is a technical limitation requiring a specific technical data flow and processing architecture, which is not a generic communication concept. The claimed invention implements a communication framework for relaying usage information and payment status. As described in the specification of US 7,013,127, in column 4, lines 52-57, “[t]he telecommunication services provider 18 then relays this information in step 78 of FIG. 2 back to the user 10 via e-mail 30, via interactive web access 40, via SMS 42, via MMS 44, and/or via a voice and/or a data call 46….” (Ex. A at 4:51-55). This multi-channel approach represents a

technical solution because it implements multiple communication pathways to ensure users receive timely information about their usage and account status. The system can notify users through various technical means, adapting to user preferences and device capabilities. The specification describes that this includes notification "if the user 10 is at a pre-designated limit," demonstrating proactive account management. (Ex. A at 4:55-57). This limitation defines a specific technical protocol for data exchange. This is not generic communication but a defined technical flow: usage data → provider → processing → user notification.

29. The limitation "receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier" is another technical limitation requiring a specific technical implementation that utilizes account identifiers in point-of-sale systems, rather than any particular payment method. The limitation "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the telecommunication services provider" is another technical limitation requiring a specific three-part technical reconciliation system, which is not a simple payment transfer. This limitation requires a specific technical reconciliation mechanism that tracks and settles payments across multiple parties. Claim 1 of the '127 Patent therefore solves a technical problem by creating an integrated architecture or integrated system that enables real-time monitoring, immediate billing, and distributed payment processing through retail infrastructure.

30. The claimed invention also implements integration at the network level between telecommunication services networks and payment processing systems. As shown in Fig. 1 of the '127 Patent, the claimed invention requires technical connections between the telecommunication

services network 24, the telecommunication services provider 18, point-of-sale terminals 16, and various communication channels. Figure 1 and the accompanying description in the specification of the '127 Patent demonstrate that the telecommunication services network 24 is technically coupled with the telecommunication services provider 18 through data communication pathways that enable transmission of call detail records (CDRs) and usage monitoring data. The point-of-sale terminals (16) are integrated into this architecture through the establishment of secure communication channels that permit the transmission of payment transaction data, including account identifiers and payment amounts, to the telecommunication services provider (18). This network-level integration enables real-time data flow between disparate systems, creating a unified technical framework for service monitoring, billing, and payment processing.

31. The technical framework achieves unification through the implementation of a centralized data processing architecture at a telecommunication services provider, which serves as the integration hub for disparate data streams. The network-level integration is evidenced by the invention's ability to correlate usage data from the telecommunication services network with payment data from point-of-sale terminals, enabling immediate account updates and service adjustments. The data flow capability is achieved through event-driven architectures where state changes in one system component trigger notifications and updates in connected systems. Traditional telecommunication billing systems operated with temporal delays between service usage, billing calculation, and payment processing, with each function residing in isolated systems that exchanged data through batch processes. The invention coordinates multiple technical systems, including telecommunication networks, point-of-sale systems, communication platforms (such as email, SMS, MMS, and voice), and interactive voice and data systems. This coordination creates a comprehensive technical ecosystem for pay-as-you-go telecommunication services.

32. Claim 1 of the '127 Patent cannot be performed with mental processing, along with pen and paper. The step of "monitoring a user's use of the telecommunication services at regular time intervals" cannot be manually performed as it necessitates a technical integration within a telecommunication network. Nor can "communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user" be performed manually because it also requires a technical integration within a telecommunication network and the ability to process results from such electronic monitoring.

33. The claims of the '127 Patent are therefore not directed to an abstract idea or law of nature.

34. The claims of the '127 Patent provide solutions to a specific and persistent problems that existed with conventional pay-as-you-go systems and methods, including how could certain users (such as individuals with bad or no credit, hourly-wage earners, individuals under the age of 18, individuals without a social security number, and individuals who wished to maintain their privacy) continue to use a prepaid phone or similar device once the original time had expired and/or been consumed. The inventions claimed in the '127 Patent provide a real-world solution to that real-world problem.

35. The invention described in the claims of the '127 Patent enables users to add to a pre-paid phone or similar device after the initial purchase thereof without using a credit or debit card or bank account and without needing to reveal personal confidential information, such as an individual's name or social security number. The patented invention does this by enabling such users to provide payment to the telecommunications service provider through a third-party willing

to accept forms of payment other than a credit or debit card, including virtual sites, like PayPal®, and brick-and-mortar businesses, like convenience stores and gas stations.

36. The claimed invention also has several inventive concepts.

37. The claimed invention is distinguishable from claims that merely recite generic steps of "receiving," "authenticating," and enabling transactions without specifying how these functions are performed. Claim 1 of the '127 patent specifies how monitoring occurs (*e.g.*, at regular time intervals), how communication flows (*e.g.*, specific bi-directional paths with processing; usage data → provider → processing → user notification), how payment is integrated (*e.g.*, through point-of-sale transactions using account identifiers), and how reconciliation occurs (*e.g.*, three-part settlement system, involving a telecommunication services provider, a point-of-sale proprietor, and a user). It was not routine, well-known, or conventional to use any of these limitations at the priority date of the '127 Patent.

38. The use of "a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider" represents an unconventional technical solution because it creates a new payment pathway that leverages existing retail infrastructure for telecommunication services. For example, "[t]he designated location 12 can be any location that processes a credit card, e.g., retail stores such as the dry cleaners, the drug store, the supermarket, etc." (Ex. A at 4:34-37). The technical implementation requires coordination between disparate systems, including retail point-of-sale terminals and telecommunication billing systems, to create a unified payment ecosystem. This goes beyond traditional payment methods by enabling cash payments through a distributed network of retail locations.

39. The independent Claim 1 further recites that "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider." This element requires the establishment of a communication pathway between the retail point-of-sale system and the telecommunication services provider's billing infrastructure. The technical implementation must include secure data transmission protocols. The system must implement authentication mechanisms to verify legitimate transactions. The system must provide real-time or near-real-time data synchronization to ensure timely account crediting.

40. Claim 1 also recites ”a payment is received from the user at a point-of-sale together with an account identifier,” necessitates the implementation of a technical interface at the point of sale. The point-of-sale terminal must be configured to accept the account identifier associated with telecommunication services. The terminal must be programmed to process payments designated for telecommunication accounts rather than retail purchases. The system must implement data capture mechanisms that associate the payment amount with the specific account identifier.

41. Claim 1 further recites that “data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider.” This element requires the establishment of a communication pathway between the retail point-of-sale system and the telecommunication services provider's billing infrastructure. The technical implementation must include secure data transmission protocols. The system must implement authentication mechanisms to verify legitimate transactions. The system must provide real-time or near-real-time data synchronization to ensure timely account crediting.

42. Claim 1 also recites “an amount of money equal to the payment amount is received from a point-of-sale proprietor by the telecommunication services provider,” which establishes a unique payment architecture for telecommunication systems. This architecture involves three

distinct parties in each transaction. The user provides payment at the retail location. The point-of-sale proprietor collects and temporarily holds these funds. The telecommunication services provider ultimately receives the payment from the proprietor. This three-part system necessitates the implementation of sophisticated tracking and reconciliation mechanisms. The system must maintain transaction records that link each user's payment to the corresponding account identifier. The technical implementation requires the establishment of a trusted intermediary relationship. The point-of-sale proprietor effectively becomes a payment agent for the telecommunication services provider. This relationship requires technical mechanisms for transaction verification and dispute resolution.

43. The ordered combination of the claim limitations was also not routine, well-known, or conventional at the priority date of the ‘127 Patent. The claimed invention’s interval-based monitoring represents an unconventional technical solution to the problem of real-time billing and account management. As described in the specification of ‘127 Patent, the system monitors usage “at regular time intervals... e.g., at 5-, 10-, 15- or 30-minute intervals.” (Ex. A at 4:40-44). This granular monitoring enables immediate billing calculations and account management decisions. Similarly, the technical advancement is further described in the ’127 Patent, which describes how “Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated.” (Ex. A at 2:26-32). The invention’s ability to monitor and process usage data at regular intervals enables dynamic account management, including the automated suspension and reactivation of accounts based on payment status. This creates a technical framework that prevents debt accumulation while maximizing service availability.

44. The technical implementation differs from traditional billing architectures. Traditional systems employ batch processing models with monthly data aggregation. The claimed system implements stream processing with continuous data flow. As explained in the '127 Patent, "Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated." (Ex. A at 2:26-32). This capability requires the system to maintain real-time usage accumulators. The invention implements calculation engines that process accumulated interval data upon session termination. The invention must also provide data access interfaces for user queries.

45. The comprehensive data flow system described in Claim 1 creates an interconnected network of information exchange that enables sophisticated management of telecommunication services. The process begins with the monitoring component, which tracks a user's telecommunication usage at regular time intervals. As described in the '127 Patent, this monitoring generates detailed usage data that captures when services are used, for how long, and what types of services are consumed. (Ex. A at 4, lines 40-57). This raw monitoring data then flows to the telecommunication services provider through established communication channels. The telecommunication services provider acts as the central processing hub in this ecosystem. When the provider receives the monitoring results, it processes this information to create meaningful data for the user. As disclosed in the '127 Patent, the provider produces "the equivalent of an updated invoice" from the call detail records received from the telecommunications services network. (Ex. A at 4:46-49). This processing involves calculating charges, applying rate plans, and preparing comprehensive account status information. The provider can then communicates these processed results back to the user through one of multiple available channels. (*Id.* at 4:51-57).

46. The claims of the ‘127 patent recite a particular way of effecting such payments via a third-party point of sale site, which are not generic and do not preempt alternate methods of payment. Alternative ways exist and are known for a user to affect payment for pay-as-you-go telecommunications services, including the prior art method of submitting a credit or debit card directly to the provider of the telecommunications services.

## IV. COUNT I
## (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 7,013,127)

47. **Direct Infringement.** Upon information and belief, Defendant directly infringed claim 1 of the ‘127 Patent in Illinois, this District. and elsewhere in the United States. As shown below, Defendant performed steps of a pay-as-you-go method for affecting payment of telecommunication services with its usage-based pricing (Pay-per-Usage) plan that satisfied each limitation of claim 1 of the ‘127 Patent. Sinch provides the Sinch Internet service monetization platform, which is an all-in-one solution that enables merchants to offer and sell their services (*e.g.*, software, telecommunication services, PDF access, etc.) on a subscription, usage-based, or pay-as-you-go model. All steps of the asserted claim were performed using the Sinch Internet service monetization platform.

48. Defendant provided a Pay-per-Usage plan that allows merchants to charge customers based on their consumption of products and services, such as calls and messages (“telecommunication services”). Defendant performs a method for affecting payment of telecommunication services. For example, Sinch provides the Engage application, which enables messaging between users and their customers, with SMS charges applied on a pay-as-you-go basis. Users are charged a flat monthly fee of $99 and incur additional charges (“payment of telecommunication services”) only based on the usage of the messaging service.




(*E.g.*, https://sinch.com/engage/features/mobile-app/).[1]




(*E.g.*, https://sinch.com/engage/).




(*E.g.*, https://sinch.com/pricing/).

[1] Red boxes and text added to figures unless otherwise noted.

| | Send * | Receive * |
|---|---|---|
| **10DLC**<br>For more information on additional fees and details learn more below<br>Learn more → | $0.0078<br>Per outbound message. Carrier fees apply. | $0.0078<br>Per inbound message. Carrier fees apply. |
| **Toll Free Numbers**<br>For more information on additional fees and details learn more below<br>Learn more → | $0.0078<br>Per outbound message. Carrier fees apply. | $0.0078<br>Per inbound message. Carrier fees apply. |
| **Short Code**<br>For more information on additional fees and details learn more below<br>Learn more → | $0.009<br>Per outbound message. Carrier fees apply. | $0.009<br>Per inbound message. Carrier fees apply. |

(*E.g.*, https://sinch.com/pricing/sms/).

| Try Sinch Engage for free<br>Give our platform a try for free for 14 days. No credit card required.<br>Get started | Conversations<br>$99/mo<br>Get started | Pro<br>$249/mo<br>Get started | Pro Plus<br>$450/mo<br>Talk to an expert | Advanced<br>$799/mo<br>Talk to an expert |
|---|---|---|---|---|
| Included SMS credits | 3,000 | 10,000 | 20,000 | 40,000 |
| Additional SMS credits (annual plan) | $0.033 | $0.0249 | $0.0225 | $0.0200 |

(*E.g.*, https://sinch.com/engage/pricing/).

## Manual credit card payment

It's super simple to pay via credit card straight from the billing page in the Sinch Engage platform.

1. Navigate to **Settings > Billing > Invoices.** Now locate the invoice and click the **Pay Now** button and follow the prompts.




(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10541350441615-Paying-invoices).

49. Defendant performed the step of monitoring a user's use of the telecommunication services at regular time intervals. For example, the Engage application enables users to use the SMS service to transmit messages to their customers based on a pay-as-you-go pricing model. As a user composes a message, the Engage application determines the message length, tracks the number of characters entered, and indicates on the application interface the number of SMS message segments that will be generated if the message exceeds the applicable character limit ("monitoring a user's use of the telecommunication services"). Each SMS message segment represents a separate billable unit, enabling the application to determine any applicable additional charges, such that users are billed based on their actual usage of the SMS service. It would be

apparent to a person having ordinary skill in the art that the character-count and segment calculations performed as the user composes a message are necessarily determined locally by client-side code executing in the user's browser, independent of any real-time server round-trip. This is consistent with the general architecture of browser-based, client-side applications, which store data locally (*e.g.*, via Web Storage or IndexedDB, both of which are partitioned by origin) irrespective of whether an active network connection to the server exists at that moment, and later transmit the accumulated data to the server once connectivity is available or on a periodic basis. Therefore, the Engage application itself monitors the SMS message segment count and further transmits it to the Engage server for billing. Further, the Engage application displays the number of messages in the inbox and provides scheduled reports, including user usage reports within a date range, such as weekly or monthly reports ("at regular time intervals"). Therefore, it would be apparent to a person having ordinary skill in the art that the Engage application monitors the usage of SMS service at regular time intervals.

To avoid surprises on your invoice, it's crucial to understand how message length impacts your costs.

In short, **longer messages cost more.**

Here's why:

- **Messages Have a Limit:** The mobile industry sets a standard character limit for a single SMS message. This is not a Sinch rule, but a standard that all providers must follow.
- **Splitting Long Messages:** If your message goes over this limit, it is automatically split into multiple, smaller message parts that are used for billing calculations. However, it will still appear as a single, complete message on the recipient's phone.
- **Billing Per Part:** Each of these individual parts is treated as a separate SMS. This means each part will use one of your credits and will be billed as a distinct message on your invoice.

(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10525032729871-How-SMS-character-limits-affect-billing).

## Outbound messages

The number of messages which have been sent within the specified date range. One message may be made up of several message parts (depending on the length of the message), but will be received as a single message on the recipient's handset.

## Units used

Units (also referred to as message parts and billing units) are the number of message parts that have been sent within the specified date range. One message can be made up of multiple message parts (units) when a message exceeds 160 characters (GSM charset). So a message of 161 characters will equate to 2 units. For multipart messages, the units are then calculated in blocks of 153 to allow for concatenation (so the message is displayed as one long message on the recipient's handset).

If you include any non-GSM character in your message the character limit is reduced to 70 for the first message and blocks of 67 for multipart messages.

(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10541449065871-Viewing-detailed-reports).

## Monitoring character limits

The message composer provides some information about your content such as the number of characters and how many SMS this equates to per contact. It will also display warnings if there are special characters or emojis in the content that may result in additional charges.




(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10525032729871-How-SMS-character-limits-affect-billing).

It means that for the same message length, with or without unicode characters, your amount of SMS sent for 1 contact can easily double up.
*Eg: If you add emojis to your message, Campaigns' maximum character count for 1 message will update from 160 to 70.*




Monitoring the number of units a message adds up to.

(*E.g.*, https://community.sinch.com/t5/Campaigns/How-does-SMS-count-work-in-Campaigns-message-editor/ta-p/9044).

**Service Data** comes to be processed by Sinch when Customers send traffic through Sinch services as part of the services agreement we have in place with those Customers. Personal data that is **Service Data** and relates to you will likely originate from a Customer, who uploads the data to Sinch as they direct a message, call or other communication event, such as a multi-factor authentication message, to you.

(*E.g.*, https://sinch.com/legal/privacy-notice/).

# What Types of Personal Data Does Sinch Process?

This section is a high-level overview of the contexts where Sinch, as a Controller, processes and collects personal data.

"Personal data" means **information that relates to an identifiable, living person**. The definition does not include information about businesses or organisations. By way of example your emai address, including the one you use at work, **is** personal data, whereas the "info@yourjob.com" email address **is not**.

For the purposes of this notice Sinch processes two types of Personal Data as a Controller:

- **Customer Data**, which means personal data relating to current and potential future Customers. This includes how Customers interact with Sinch platforms and services, and how Sinch in turn handles information about Customers related to the use of Sinch services and platforms, and,
- **Service Data,** which means the routing and message data, including message content, that is created and processed as a part of provision of services to Sinch Customers.

(*E.g.*, https://sinch.com/legal/privacy-notice/).

2. In the resulting modal, you can select the required parameters:

**Schedule report name** – if you give your report a name associated with the parameters, it'll be easy to identify from your list of reports.
**Report type** – select from Detailed report, User usage report, or Sub account usage report.
**Date range** – select from Current day, Yesterday, Weekly (Mon–Sun), Weekdays, or Monthly.
**Status** – you can **select all** to include messages with any status in your report, or you can specify a status if you'd like a more focused report – for example, **Undelivered** messages. Select from *Delivered, Submitted, Undelivered* (*Failed, Rejected,* and *Expired*), *Pending* (*Enroute, Held,* and *Undefined*), and *Read*. To learn more about these message statuses, check out this article.
**Message direction** – select from Sent, Received, or both.
**Accounts** – select which account(s) you'd like to include in your report.
**Report recipients** – enter the email address of up to five recipients to receive the report.
**Advanced parameters** – you also have the option to specify which reporting fields to include in the CSV file, as well as choose the time zone, and when you will receive the report.

(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/11183935941519-Scheduled-reports).

# Sinch Engage Inbox

27 days ago · Updated Follow

**The inbox allows you to view all inbound messages from the past 90 days, providing a highly effective way to manage conversations with your contacts in real time and deliver an organic engagement experience to your customers.**

(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10525024006031-Sinch-Engage-Inbox).

The **Web Storage API** provides mechanisms by which browsers can store key/value pairs, in a much more intuitive fashion than using cookies.

## Concepts and usage

The two mechanisms within Web Storage are as follows:

- `sessionStorage` is partitioned by browser tabs and by origin. The main document, and all embedded browsing contexts (iframes), are grouped by their origin and each origin has access to its own separate storage area. Closing the browser tab destroys all `sessionStorage` data associated with that tab.
- `localStorage` is partitioned by origin only. All documents with the same origin have access to the same `localStorage` area, and it persists even when the browser is closed and reopened.

(*E.g.*, https://developer.mozilla.org/en-US/docs/Web/API/Web_Storage_API).

# IndexedDB API

**Note:** This feature is available in Web Workers.

IndexedDB is a low-level API for client-side storage of significant amounts of structured data, including files/blobs. This API uses indexes to enable high-performance searches of this data. While Web Storage is useful for storing smaller amounts of data, it is less useful for storing larger amounts of structured data. IndexedDB provides a solution. This is the main landing page for MDN's IndexedDB coverage — here we provide links to the full API reference and usage guides, browser support details, and some explanation of key concepts.

(*E.g.*, https://developer.mozilla.org/en-US/docs/Web/API/Web_Storage_API).

50. Defendant performed the step of communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user. For example, the Engage application

charges users based on their actual use of telecommunication services such as message length, no of messages, and the carrier used. To enable this, the Engage application transmits the monitored message usage data ("results of said monitoring") to the Sinch server and telecommunication operators ("telecommunication services provider") to process the message usage and generate a bill based on this usage. This bill is displayed to the user ("communicates processed results to said user") within the Engage application, where the user downloads invoices and pays the bill.

| Type of recipient | Why is data shared? (Purpose) |
|---|---|
| Sinch Group entities | Your personal data will be shared within the Sinch Group, including for business continuity and information security and support purposes, as well as for legally mandated reporting, bookkeeping, billing, and similarly important activities. |
| Telecommunications operators | For various Sinch services, communications are sent over telephone networks, in which case the message transmitted, and metadata, is shared with those network operators as the communication is sent as a part of ensuring it arrives at the correct destination and can be billed properly. |

communicating results of said monitoring to a telecommunication services provider

(*E.g.*, https://sinch.com/legal/privacy-notice/).

# What Types of Personal Data Does Sinch Process?

This section is a high-level overview of the contexts where Sinch, as a Controller, processes and collects personal data.

"Personal data" means **information that relates to an identifiable, living person**. The definition does not include information about businesses or organisations. By way of example your emai address, including the one you use at work, **is** personal data, whereas the "info@yourjob.com" email address **is not**.

For the purposes of this notice Sinch processes two types of Personal Data as a Controller:

- **Customer Data**, which means personal data relating to current and potential future Customers. This includes how Customers interact with Sinch platforms and services, and how Sinch in turn handles information about Customers related to the use of Sinch services and platforms, and,
- **Service Data,** which means the routing and message data, including message content, that is created and processed as a part of provision of services to Sinch Customers.

(*E.g.*, https://sinch.com/legal/privacy-notice/).

| | Send * | Receive * |
|---|---|---|
| **10DLC**<br>For more information on additional fees and details learn more below<br>Learn more → | $0.0078<br>Per outbound message.<br>Carrier fees apply. | $0.0078<br>Per inbound message.<br>Carrier fees apply. |
| **Toll Free Numbers**<br>For more information on additional fees and details learn more below<br>Learn more → | $0.0078<br>Per outbound message.<br>Carrier fees apply. | $0.0078<br>Per inbound message.<br>Carrier fees apply. |
| **Short Code**<br>For more information on additional fees and details learn more below<br>Learn more → | $0.009<br>Per outbound message.<br>Carrier fees apply. | $0.009<br>Per inbound message.<br>Carrier fees apply. |

(*E.g.*, https://sinch.com/pricing/sms/).

The **Plan** tab is where you can view and manage your subscription, billing, and payment information:




**Billing Details** – this is where you can view your account information relating to your subscription, including activating automatic payments.

**Billing Information** – this is where you can view and edit your billing details, including the email address that all your downloads are emailed to.

Payment Methods – this is where you can add/update your payment details on file.

(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10540789459855-Account-settings-overview).

2. In the resulting modal, you can select the required parameters:

**Schedule report name** – if you give your report a name associated with the parameters, it'll be easy to identify from your list of reports.
**Report type** – select from Detailed report, User usage report, or Sub account usage report.
**Date range** – select from Current day, Yesterday, Weekly (Mon–Sun), Weekdays, or Monthly.
**Status** – you can **select all** to include messages with any status in your report, or you can specify a status if you'd like a more focused report – for example, **Undelivered** messages. Select from *Delivered, Submitted, Undelivered* (*Failed, Rejected,* and *Expired*), *Pending* (*Enroute, Held,* and *Undefined*), and *Read*. To learn more about these message statuses, check out this article.
**Message direction** – select from Sent, Received, or both.
**Accounts** – select which account(s) you'd like to include in your report.
**Report recipients** – enter the email address of up to five recipients to receive the report.
**Advanced parameters** – you also have the option to specify which reporting fields to include in the CSV file, as well as choose the time zone, and when you will receive the report.

(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/11183935941519-Scheduled-reports).

## Manual credit card payment

It's super simple to pay via credit card straight from the billing page in the Sinch Engage platform.

1. Navigate to **Settings > Billing > Invoices.** Now locate the invoice and click the **Pay Now** button and follow the prompts.




(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10541350441615-Paying-invoices).

51. Defendant performed a step of receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the telecommunication services provider. For example, the Engage application enables the user to make payments for the used SMS services through multiple payment methods, including credit cards, debit cards, and other online means. Further, such payment methods involve the user making a payment through a digital interface or payment gateway ("point-of-sale") linked to the user's billing account or mobile number ("account identifier"), and upon completion of the transaction, transaction details are generated and communicated ("data indicative of the payment transaction is received") to Sinch

server and telecommunication operators (the telecommunication services provider). Therefore, upon information and belief, the payment for the services is received by the telecommunication services provider from the payment processor or financial institution, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the services provider.

> **Billing Details** – this is where you can view your account information relating to your subscription, including activating automatic payments.
> **Billing Information** – this is where you can view and edit your billing details, including the email address that all your downloads are emailed to.
> Payment Methods – this is where you can add/update your payment details on file. You can add multiple payment methods to keep handy for any manual payments, as well as nominate a default for any automatic payments and pre-paid top ups.

(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10540789459855-Account-settings-overview).




(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10540789459855-Account-settings-overview).

5. Automatic payments should now be **activated** for your **default payment method,** you can confirm this by checking that it now says **On** under **Automatic Payment:**




(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10541350441615-Paying-invoices).

## Update payment method

1. First you will need to add the new payment method following the steps above.

2. To nominate your new payment details as the default method of payment, just click on the three dots next to these details and select **Set as Default**:




(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10541350441615-Paying-invoices).




(*E.g.*, https://support.app.sinch.com/hc/en-us/articles/10540789459855-Account-settings-overview).

52. Plaintiff has been damaged as a result of Defendant's infringing conduct. Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such infringement of the '127 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

53. The asserted claim of the '127 Patent is a method claim to which the marking requirement is not applicable. Plaintiff has therefore complied with the marking statute.

## V. JURY DEMAND

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that claim 1 of United States Patent No. 7,013,127 has been infringed directly and indirectly, either literally and/or under the doctrine of equivalents, by Defendant;

b. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

c. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

d. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

September 18, 2026

Respectfully Submitted,

*/s/ Steven G. Kalberg*
David R. Bennett (IL Bar No. 6244214)
Steven G. Kalberg (IL Bar No. 6336131)
Direction IP Law
P.O. Box 14184
Chicago, IL 60614-0184
(312) 291-1667
dbennett@directionip.com
skalberg@directionip.com

*Attorneys for Plaintiff*
*Pay As You Go, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2026, I electronically filed the above documents with the Clerk of Court using CM/ECF which will send electronic notification of such filings to all registered counsel.

*/s/ Steven G. Kalberg*
Steven G. Kalberg